# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 4:16-CR-00006-02 |
| | : | |
| v. | : | (Judge Brann) |
| | : | |
| ANTOINE PARIS DAVIS, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### JULY 7, 2017

On September 30, 2016, a jury sitting in Williamsport, Pennsylvania found

the Defendant, Antoine Paris Davis, guilty of conspiracy to distribute controlled

substances in violation of Title 21, United States Code, Section 846 and possession

with intent to distribute in violation of Title 21, United States Code, Section

841(a)(1). The jury affirmatively answered two interrogatories as to whether the

Defendant was responsible for agreeing to distribute—and possessing with intent to

distribute—100 grams or more of heroin.

The Court held a presentence conference in this matter on March 30, 2017. An

Order scheduling briefing and sentencing and noticing the parties that I was

considering an upward variance from the Guideline range of 120 months was issued

on April 6, 2017 and can be found at ECF No. 183. For the reasons contained herein,

I will impose an upward variance of 24 months, resulting in an ultimate sentence of 144 months or 12 years.

## I. THE DEFENDANT's MOTION TO APPOINT NEW COUNSEL IS DENIED.

At the outset, I note that a letter from Mr. Davis was docketed by the Clerk of Court on July 3 of this week. That letter requests replacement of defense counsel, Mr. Shubin.

The Third Circuit has explained that eleventh-hour attempts to delay sentencing proceedings by, for instance, moving to change counsel or moving to withdraw a guilty plea, may freely be denied so long as the defendant will receive a fair hearing. *United States v. Hannibal*, 663 F. App'x 206, 210 (3d Cir. 2016) (Krause, J.).A fair sentencing hearing "requires that a defendant receive notice of, and a reasonable opportunity to comment on, (a) the alleged factual predicate for his sentence, and (b) the potential punishments which may be imposed at sentence." *Id.*

Likewise, where a sentencing hearing is not the "appropriate venue" for the defendant to raise the particular issues of which he complains in a new counsel motion, such a petition is rightly denied at that juncture. *United States v. Thomas*, 48 F. App'x 382, 384 (3d Cir. 2002).

Further, in resolving motions of that nature, the Court must consider "the harm to the administration of justice" and the "delay in the resolution of the matter." *United States v. Fattah*, 159 F. Supp. 3d 545, 548 (E.D. Pa. 2016) (Bartle, J.).

Lastly, I note that, pursuant to the decision of the United States Court of Appeals for the Third Circuit in *United States v. Welty*, 674 F.2d 185, 187 (3d Cir. 1982), the concerns raised in Mr. Davis's letter to the Court do not constitute good cause for substitution. The allegations contained therein are of questionable veracity, and Mr. Davis has nevertheless failed to show how any of those allegations materially impacted either Mr. Shubin's representation or Mr. Davis's right to a fair sentencing hearing. To the contrary, Mr. Shubin has demonstrated vigorous advocacy on Mr. Davis's behalf, as he does for all of his clients. Neither is today's sentencing hearing the proper venue for most of the concerns Mr. Davis advances. Indeed, proceeding without the assistance of Mr. Shubin would not be a competent or advisable decision.

For those who review this matter later on, I will note from the outset that my experiences with Mr. Davis over the past year and a half have taught me that he is a first-class manipulator who attempts to twist claims of little moment and questionable truth into issues of genuine legal significance. Instead, his schemes often accomplish nothing more than wasting the Court's time while it searches for the truth. This is one representative instance of Mr. Davis's many attempts to turn nothing into something. Like his earlier efforts to manipulate the Court, this one fails as well. Though mesmerizing to some, Mr. Davis's arguments are unpersuasive to me.

Accordingly, the motion to substitute new counsel is denied, and Mr. Shubin will continue to represent Mr. Davis.

## II. BACKGROUND OF SENTENCING PROCEEDING.

In accordance with two cases by the Supreme Court of the United States: the first entitled *Gall v. United States* and the second entitled *Nelson v. United States*, I am required to engage in a three-step process.

First, I will calculate the guideline range based upon the sentencing Guidelines promulgated by the United States Sentencing Commission.

Second, I will formally rule on any motions for departure and state the impact, if any, on the Guideline range.

Third, I will exercise discretion and consider the factors set forth at Title 18, United States Code, Section 3553(a). Following a decision by the Supreme Court in *United States v. Booker*, the sentencing guidelines are to be treated as advisory rather than as mandatory. Therefore, although I am required to start with the Guidelines as an initial benchmark, I will not presume that the Guideline range is reasonable. Rather, I will make an individualized assessment based upon the facts presented.

## III. THE DEFENDANT'S OBJECTION TO UNITED STATES SENTENCING GUIDELINE § 3C1.1'S OBSTRUCTION OF JUSTICE OR IMPEDING THE ADMINISTRATION OF JUSTICE ENHANCEMENT IS OVERRULED.

The Defendant's only substantive objection to the Presentence Report relates to the application of United States Sentencing Guideline § 3C1.1's obstruction of

justice or impeding the administration of justice enhancement, as implemented at paragraphs 20 and 21 of the Presentence Report. That objection is OVERRULED.

That Guideline provides that "[i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels."

Application Note 4 to that Guideline provides "a non-exhaustive list of examples of the types of conduct to which this adjustment applies." Example 4(C) on that list is "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding."

Further, Application Note 9 provides that "Under this section, the defendant is accountable for the defendant's own conduct and for conduct that the defendant aided or abetted, counseled, commanded, induced, procured, or willfully caused."

Application of the obstruction enhancement was based upon the following conduct: After the search of 321 Tinsman Avenue, an apartment shared by Mr. Davis, his girlfriend Angelie Lopez, and Mr. Davis's co-conspirator Raheem Jarmar Ruley, the three suspects were arrested and taken to Lycoming County Prison.

In a series of recorded prison conversations with his mother, Donna Burney Ruley, Mr. Ruley stated that Mr. Davis had asked him to take responsibility for the drugs recovered by police from the apartment. During these discussions, Mr. Ruley stated, "I ain't taking that," and ultimately agreed with his mother that Mr. Davis's proposal that he accept full responsibility for the drugs was "a no go."

Thereafter, following the return of the federal Indictment on January 14, 2016, Mr. Ruley and Mr. Davis were later held in custody together at the Columbia County Prison. During that time, Mr. Ruley signed the so-called "Affidavit of Truth," a document that gained particular notoriety for all the wrong reasons throughout the pendency of this litigation. The Affidavit, dated March 3, 2016, stated first, that there never was any agreement between Mr. Davis and Mr. Ruley to distribute drugs and second, that Mr. Davis was not involved in any way with drug activity. Mr. Ruley and Mr. Davis had the Affidavit notarized, and Mr. Ruley swore that that its contents were "true and correct." Mr. Davis would later introduce the Affidavit of Truth in support of certain pretrial motions and as substantive evidence at trial.

However, at his change of plea hearing and to no one's surprise, Mr. Ruley admitted that the Affidavit of Truth was anything but veracious, acknowledging full well that the averments contained therein not only were false but were actually composed by Mr. Davis for Mr. Ruley to sign.

In my view, even the most cursory application of the above guidance to the operative facts reveals that the enhancement for obstructing or impeding the due administration of justice is certainly warranted to punish such unabashed gamesmanship.

Accordingly, the Guideline calculations contained within the Pre-sentence Report remain unchanged.

## IV. PURSUANT TO UNITED STATES SENTENCING GUIDELINE § 5G1.1(B), THE GUIDELINE RANGE IS 120 MONTHS.

I will now calculate the Guideline range. A total offense level of twenty-six (26) and a criminal history category of three III suggest a range of imprisonment of 78 to 97 months.

However, based upon the jury's heroin quantity finding, Title 21, United States Code, Section 841(b)(1)(B) provides for a mandatory minimum term of imprisonment of 60 months, which minimum term of imprisonment is then doubled to 120 months pursuant to the Government's filing of an Information Establishing a Prior Felony Drug Conviction under Title 21, United States Code, Section 851. That Information can be found at ECF No. 48.

The Defendant has not denied the Information Establishing a Prior Felony Drug Conviction as to the 1999 Lycoming County Court of Common Pleas case, with the understanding that any challenge to a prior conviction that is not made

before sentence is imposed may not be raised thereafter to attack the ultimate sentence.

Under these circumstances, United States Sentencing Guideline § 5G1.1(b) states that "[w]here a statutorily required minimum sentence is greater than the maximum of the applicable guideline range, the statutorily required minimum sentence shall be the guideline sentence." As the United States Court of Appeals for the Fifth Circuit has explained, "For those situations in which the mandatory minimum exceeds the range for the entire offense level, the 'guideline sentence' would thus be the same as the 'guideline range,' even if it involves a 'range' of only one number." *United States v. Carter*, 595 F.3d 575, 580–81 (5th Cir. 2010) (per curiam). The United States Court of Appeals for the District of Columbia Circuit confirmed as much, noting that "where the mandatory minimum calls for a sentence longer than anything in the guideline range, the statute replaces the guideline range and becomes the guideline sentence." *In re Sealed Case*, 722 F.3d 361, 367 (D.C. Cir. 2013).

When reviewing a sentence, the courts of appeal thus typically consider the final guideline range (after application of a mandatory minimum) as the baseline for measuring the reasonableness of a variance. *See United States v. Varsanyi*, 392 F. App'x 15 (3d Cir. 2010) (Vanaskie, J.) (affirming substantive reasonableness of upward variance based upon 120-month guideline sentence that resulted from

application of 10-year mandatory minimum); *United States v. Broussard*, 669 F.3d 537 (5th Cir. 2012) (evaluating substantive reasonableness of upward variance based upon 120-month guideline sentence that resulted from application of 10-year mandatory minimum). *See also United States v. Murphy*, 591 F. App'x 377, 380 (6th Cir. 2014) ("The term 'guideline sentence' in section 5G1.1(a) is synonymous with 'recommended sentence,' 'advisory sentence,' or 'Guideline range.'").

The reason for this prioritization is that legislation and the guidelines themselves both make clear that mandatory minimums (or maximums) are determinative of the guideline range to the extent that they may cabin or extend the range's upper or lower bounds. As the Supreme Court of the United States recently reiterated in *Dorsey v. United States*, 567 U.S. 260, 132 S. Ct. 2321, 2328 (2012), statutory enactments by Congress take precedence over the guidelines:

> The 1986 Drug Act, like other federal sentencing statutes, interacts with the Guidelines in an important way. Like other sentencing statutes, it trumps the Guidelines. Thus, ordinarily no matter what the Guidelines provide, a judge cannot sentence an offender to a sentence beyond the maximum contained in the federal statute setting forth the crime of conviction. Similarly, ordinarily no matter what range the Guidelines set forth, a sentencing judge must sentence an offender to at least the minimum prison term set forth in a statutory mandatory minimum.

*See also United States v. Hameed*, 614 F.3d 259, 267 (6th Cir. 2010) ("The Commission's policy statements are mandatory, however, in the sentence-modification context, not by dint of the guidelines themselves but based on

the plain text of a federal statute."); *United States v. McClain*, 691 F.3d 774, 779–80 (6th Cir. 2012) ("The Sentencing Commission's policy statements explicitly provide that the mandatory minimum becomes a defendant's applicable range.").

In parallel cases involving the reasonableness of a departure pursuant to § 3553(e), the United States Court of Appeals for the Sixth Circuit has noted that "the guideline range resulting from that base offense level was not 'applicable' because it was not the correct point from which the departure should have been measured." *Hameed*, 614 F.3d at 268. "[W]e now join our sister circuits and hold that the *appropriate starting point* for calculating a downward departure under 18 U.S.C. § 3553(e) is *the mandatory minimum sentence itself.*" *United States v. Stewart*, 306 F.3d 295, 332 (6th Cir. 2002) (emphasis added). Other appellate courts have concluded the same. *United States v. Hood*, 556 F.3d 226, 234–35 (4th Cir. 2009) ("First, it overlooks the fact that the only 'guideline range applicable' to his sentence, *see* U.S.S.G. § 1B1.10(a)(1), was the statutorily mandated 'guideline sentence' of 240 months' imprisonment made applicable by U.S.S.G. § 5G1.1(b)."); *United States v. Benton*, 546 F. App'x 365, 369 (5th Cir. 2013) ("Thus, the statutory minimum, and not the guideline range, is the correct starting point for imposing a sentence under § 3553(e).").

Accordingly, I now find that the Defendant, ANTOINE PARIS DAVIS, has a criminal history category of three (III) and an offense level of twenty-six (26), and

the Guideline range of imprisonment, by operation of the mandatory minimum and the prior conviction, is 120 months.

## V. THERE ARE NO PENDING MOTIONS FOR DEPARTURE. ACCORDINGLY, THE GUIDELINE RANGE IS 120 MONTHS.

Next, I note that there are no pending motions for departure. The sole inquiry raised by the Court and briefed by the parties is the propriety of an upward variance. Thus, Mr. Davis has a criminal history category of three (III), an offense level of twenty-six (26), and the Guideline range of imprisonment is 120 months. The Office of Probation concurs in this determination.

## VI. CONSIDERATION OF THE 18 U.S.C. § 3553(a) FACTORS.

The parties were given an opportunity to offer argument as to the § 3553(a) factors, and the Defendant was given the opportunity to make an allocution. I refer the reader to the record for the full discussion.

The sentence imposed satisfies the purposes set forth in 18 U.S.C. § 3553(a), including the necessity of deterrence and just punishment, promotion of respect for the law, protection of the public, avoidance of unwarranted disparities, and assurance of correctional treatment for the Defendant and restitution to any victims of the offense—and it reflects this Court's full consideration of all factors relevant to the sentencing determination—including the nature and seriousness of the offense, the history and characteristics of the Defendant, the kinds of sentences available and the advisory range and policies prescribed by the United States Sentencing

Commission. In its 2005 decision *United States v. Booker*, the Supreme Court of the United States clarified that the United States Sentencing Guidelines were effectively advisory. Thus, after *Booker*, although a district court is required to consider the applicable sentencing guideline range, it is also permitted to tailor the sentence in light of the factors set forth at 18 U.S.C. § 3553(a). That section requires the district court to impose a sentence sufficient but not greater than necessary to comply with its statutorily-enumerated objectives.

As the Supreme Court later explained in its 2007 decision *Gall v. United States*, the district court must consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In doing so, the district court may not presume that the sentencing guideline range is reasonable. Rather, the district court must make an individualized assessment based on the facts presented.

I have considered the § 3553(a) factors applicable to this case. My reasoning is as follows:

> **a.  The Nature And Circumstances Of The Offense And The History And Characteristics Of The Defendant.**

The following facts were offered by the Government in connection with Mr. Davis's trial or were expressly determined by jury interrogatories. To the extent that any of these facts were used to apply a Guideline or other sentencing enhancement, I expressly find that these facts were proven at least by a preponderance of the evidence. *United States v. Fisher*, 502 F.3d 293, 306 (3d Cir. 2007) (Hardiman, J.).

The following facts are a representative, but not a complete, recitation of those offered at trial.

Antoine Paris Davis operated a significant drug trafficking network that had a palpable impact on the greater Williamsport community. From June 14, 2014, through January 14, 2016, Mr. Davis and Raheem Ruley agreed to sell and deliver heroin and cocaine to drug users in Williamsport, Lycoming County, within the Middle District of Pennsylvania. The pair used cellular telephones to receive customer orders and then would meet the customers at prearranged locations in the community to deliver heroin and cocaine.

Mr. Davis rented a residence at 321 Tinsman Avenue in Loyalsock Township, Lycoming County and stayed there with his girlfriend, Angelie Lopez, in the larger bedroom on the second floor. Mr. Davis's co-conspirator Raheem Jarmar Ruley would also stay at the 321 Tinsman Avenue residence from time to time. According to Ms. Lopez, Mr. Davis would take the rent money to the landlord monthly.

Shortly after Mr. Davis, Ms. Lopez, and Mr. Ruley were arrested, Ms. Lopez placed a prison call to a mutual acquaintance of hers and Mr. Davis's. The acquaintance told Ms. Lopez, "Ant says he loves you and everything will be cool and don't even worry about it." Ms. Lopez responded, "Well give him a message. Tell him I said, fuck him, and that shit's over. He got me in here, and he's not speaking up."

From time to time, Mr. Ruley also stayed at the Tinsman Avenue residence, where he and Mr. Davis would keep supplies of heroin and cocaine, as well as cash proceeds, in two safes that investigators found bolted to the floor. Between June 3 and 16, 2015, Pennsylvania State Police troopers made three separate undercover purchases of cocaine from Mr. Ruley. Following the last drug transaction on June 16, the troopers executed an anticipatory search warrant at 321 Tinsman Avenue. I will now recount those transactions in more detail.

On June 3, 2015, an undercover trooper received information from a Confidential Informant that he could buy two "8-balls" (or two one-eighth ounces) of cocaine for $400 from an individual known as "Ant." Ant was a nickname used by Antoine Paris Davis. The Informant showed text message exchanges with a cellular telephone used by "Ant" concerning the availability of cocaine. The Informant then texted "Ant" about buying an "8-ball" and was directed to meet the drug supplier at the Weis Market store at the intersection of River Avenue and Washington Boulevard in Williamsport. The Informant was then directed to meet the supplier near the Pizza Hut on the "Golden Strip" in Williamsport.

When the undercover trooper and the Informant arrived to meet "Ant," Mr. Ruley entered the back seat of the vehicle and provided the Informant with a baggie of cocaine in exchange for $400. Approximately five minutes later, surveillance officers observed Mr. Ruley seated on the steps of 321 Tinsman Avenue.

By way of background, Mr. Davis and Mr. Ruley were apparently not related by blood, but the two were close acquaintances. In fact, Mr. Davis referred to Donna Burney Ruley, Mr. Ruley's mother, as "mom." At trial, Ms. Burney Ruley testified that several of her acquaintances in the neighborhood of "the Duce" or Second Street in Williamsport call her "Mom" or "Aunt Donna." Ms. Burney Ruley testified that she would frequently take sandwiches to Mr. Davis, Ms. Lopez, and their child at the Tinsman Avenue apartment during her lunch breaks from the nearby Third Street McDonalds. It was on one of those visits that Ms. Burney Ruley was lying underneath an air conditioner in the couple's bedroom when she sat up to find Ms. Lopez and Mr. Davis packaging drugs in small plastic baggies with tiny rubber bands. Later on, Mr. Davis would also allow Hakim Price to stay at the Tinsman Avenue residence. Hakim Price was Mr. Ruley's cousin and Ms. Burney Ruley's nephew. After his arrest, Mr. Davis also called Ms. Burney Ruley from prison, at which time she encouraged Mr. Davis to take responsibility for the portion of the drugs that were his.

With that background in mind, I return to the narrative of the undercover buys. On June 10, 2015, the undercover trooper contacted the target cellular telephone and arranged to meet the supplier for a second time to buy cocaine. The trooper drove to the prearranged meeting location and picked up Mr. Ruley near Tinsman and Homewood Avenues in Williamsport. Mr. Ruley directed the trooper

to drive to another location, at which point, Mr. Ruley placed a bag of cocaine in the center console of the vehicle in exchange for $400. Prior to the transaction, a state trooper conducting surveillance near 321 Tinsman Avenue observed Mr. Ruley descend the porch steps of the residence and walk in the direction of the prearranged meeting location. Before and after the transaction, two other state troopers saw Mr. Ruley exit and re-enter 321 Tinsman Avenue.

On June 12, 2015, Mr. Ruley texted the undercover trooper, and the two discussed the purchase of an ounce of cocaine for $1,200. Following that exchange, the trooper prepared an anticipatory search warrant for 321 Tinsman Avenue. The warrant was contingent upon Mr. Ruley exiting 321 Tinsman Avenue and delivering a quantity of cocaine to the undercover trooper. On June 15, 2015, Mr. Ruley contacted the trooper and advised that the price would be $1,300 for an ounce of cocaine, but later texted again, explaining that the price was still $1,200. The next day, Mr. Ruley texted and spoke to the undercover trooper by telephone to confirm a time to conduct the cocaine delivery. In a follow-up telephone conversation, Mr. Ruley told the trooper that he had only seven, "8-balls" of cocaine available at a price of $900 and could provide the rest of the cocaine at a later time.

On June 16, 2015, Mr. Ruley arranged for the trooper to pick him up on Homewood Avenue. Just before the meeting, surveillance officers observed Mr. Ruley exit the front door of 321 Tinsman Avenue and walk in the direction of the

prearranged meeting location. Once inside the undercover vehicle, Mr. Ruley placed two baggies of cocaine in the center console and removed $900 in pre-recorded buy money from the cup holder. As the trooper pulled near the intersection of Homewood and Tinsman Avenue, Mr. Ruley reaffirmed that he would be able to deliver the rest of the cocaine the next day.

After Mr. Ruley exited the vehicle, the undercover trooper gave a prearranged signal to arrest Mr. Ruley and gained entry to 321 Tinsman Avenue. As investigators approached him, Mr. Ruley began running toward Homewood Avenue through a private yard. He led investigators on a lengthy foot chase, discarding certain personal belongings along the way, and was arrested in the parking lot of the TJ Maxx Plaza.

After the controlled purchase that day, troopers conducted a search of 321 Tinsman Avenue. They recovered a safe in a middle hallway containing about four ounces of heroin, 16 bags of cocaine, bags containing approximately 11 grams of cocaine powder, packaging materials, and a digital scale. In a kitchen drawer, investigators recovered Mr. Ruley's wallet which contained $380 in cash and his Pennsylvania identification card. In the same drawer as the wallet, investigators recovered plastic bags containing crack cocaine and vials of marijuana.

Witnesses confirmed that Mr. Ruley occupied one of the bedrooms at the residence near the hallway closet where the safe containing heroin and cocaine was

found. Inside a dresser drawer in Mr. Ruley's bedroom, investigators recovered two digital scales and 9mm and .38 caliber rounds of ammunition.

Mr. Davis, Mr. Ruley's co-conspirator, was present when investigators arrived to search the residence. In a bedroom containing identification connecting Mr. Davis to the address, investigators recovered another safe containing about $1,000, which included prerecorded buy money used to purchase two bags of cocaine from Mr. Ruley during an earlier transaction. The safe was unlocked and bolted to the floor. At trial, Mr. Davis testified that he had opened the safe prior to the troopers' entrance so that the officers could readily access its contents.

Police also found six, .40 caliber rounds of ammunition and a small bag of cocaine in the safe. Drug packaging and processing materials, including a metal grinder, were found in the bedroom where the safe was located. Lycoming County court documents bearing Mr. Davis's name were also found in the bedroom. The owner of the property reported that Mr. Davis lived at 321 Tinsman Avenue and paid the rent. Mr. Davis also had a key to the residence on his person at the time of the search.

In addition to the safe containing the buy money, the cocaine inside his bedroom closet, and the other indicia just listed, investigators also found several cellular telephones used by Mr. Davis.

At trial, a Pennsylvania State Police trooper presented a detailed report on the contents of Mr. Davis's phone, compiled with the assistance of federal phone analytic software. One of the phones contained a contact list that included a telephone number for "Scrizz." Significantly, the number for the contact "Scrizz" on Mr. Davis's cell phone was the same number called by the undercover agent to reach Mr. Ruley and arrange the purchase of cocaine from him on June 3 and June 10, 2015. Trial witnesses would further confirm that Mr. Ruley was known by nicknames like "Scrap" or "Scrizz." Mr. Davis's cellular telephone also contained several text message exchanges with the number contacted by the undercover trooper to arrange the drug deliveries with Mr. Ruley during the same time period as the deliveries by Mr. Ruley to the undercover trooper. On top of that, Mr. Davis's telephone contained text messages to and from numerous individuals, including. Mr. Ruley, discussing drug trafficking activities, such as heroin, cocaine, marijuana, and prescription painkiller transactions.

Prior to trial, this Court denied motions to suppress and sever filed by both co-conspirators, noting the broad and inherently prophylactic nature of the applicable drug conspiracy laws. For instance, the Third Circuit in *United States v. Price*, 13 F.3d 711, 732 (3d Cir. 1994), observed that "[t]he sentencing court can consider . . . the conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the

defendant." Again, in *United States v. Gibbs*, 190 F.3d 188, 219 (3d Cir. 1999), our Court of Appeals applied its decision in *Price*, concluding that "a leader of a drug conspiracy is responsible for drug quantities transacted by his subordinates in furtherance of the conspiracy." These features of conspiracy law understandably render such charges what the late Honorable Learned Hand, writing for the United States Court of Appeals for the Second Circuit, once described as "the darling of the modern prosecutor's nursery." *Harrison v. United States*, 7 F.2d 259, 263 (2d Cir.1925). As I have stated before, once federal drug conspiracy defendants are in for a penny, they are in for a pound.

In the weeks leading up to trial, Mr. Ruley ultimately pled open to the indictment prior to trial and was sentenced by this Court to a term of imprisonment of 60 months.

At Mr. Davis's September 2016 trial, a number of witnesses hailing from the Greater Williamsport community, including family members of the Defendants, reported either having knowledge of the pair's drug distribution activities or having purchased drugs from Mr. Ruley or Mr. Davis in the past. In addition to those witnesses who positively identified Mr. Davis, one recovering addict discussed bartering vehicles to pay off drug debts and another recovering addict remarked that she remembered Mr. Davis as a known drug distributor because of his "distinctive" appearance.

According to the Pennsylvania State Police Laboratory, the seized substances consisted of a total of 95.10 grams of cocaine, 103.94 grams of heroin, and 19.89 grams of marijuana. Jury interrogatories confirmed that Mr. Davis conspired to distribute and possessed with intent to distribute 100 grams and more of heroin.

### b.    The Need For The Sentence Imposed.

As a general matter, in a 2015 Memorandum entitled "Guidance for Heroin Cases," which was circulated among the judges of this Court, the Honorable Peter J. Smith, then United States Attorney for this District, argued, among other things, that "heroin cases present a greater risk of harm to individuals and the community." That argument is certainly applicable here, given the offense conduct just recounted.

Moreover, in its 2015 National Heroin Threat Assessment, the United States Drug Enforcement Administration reported that heroin use and availability are on the rise and causing more overdose deaths than at any time in the last decade. Relatedly, the United States Centers for Disease Control and Prevention (hereinafter "the CDC") has characterized the situation as "today's heroin epidemic." The CDC reported that heroin use has increased across the United States among men and women, most age groups, and all income levels. As heroin use has increased, so have heroin-related overdose deaths. The CDC estimated that between 2002 and 2013, the rate of heroin-related overdose deaths nearly quadrupled, and more than 8,200 people died in 2013. A similar—albeit localized—picture is painted by the

Pennsylvania State Coroner's Association Report on Overdose Death Statistics, published in 2014. Those trends have unfortunately continued in recent years.

As the Government has argued in so many prior proceedings, I would be remiss to ignore the attendant costs and the exceptional burdens that the recent heroin epidemic has placed on our courts, our police and first responders, and our local hospitals. Indeed, several local media reports have detailed that Williamsport's primary hospital treated 51 known heroin overdose patients over a 48-hour period just last week; three patients died.

The Court is also mindful that the sentence it has chosen to impose may have some deterrent impact both specifically as to this particular Defendant, as well as generally for other members of society.

### c.    The Kind Of Sentences Available.

The Court has considered the kinds of sentences available in this case, as well as the various ways in which a sentence could be composed and determined to run, and has concluded that an incarcerative sentence with a subsequent term of supervised release is the only type of sentence sufficient but not greater than necessary to satisfy the statutory objectives.

### d.    The Sentencing Guidelines.

Moreover, the Court has considered, as a baseline, the Guideline range applicable to this Defendant.

### e.     The Need To Avoid Unwarranted Sentence Disparities.

In arriving at the appropriate sentence for Mr. Davis, the Court has considered, among other factors, the need to avoid significant sentencing disparities among defendants with similar levels of culpability, similar levels of leadership, and similar criminal histories as Mr. Davis in related federal drug conspiracies. Having reviewed, with the assistance of the United States Probation Office, several other sentencing determinations in heroin conspiracy cases imposed in the Middle District of Pennsylvania and nationwide, the sentence is therefore designed to avoid unwarranted sentencing disparities among defendants similar to Mr. Davis who have committed related federal drug offenses.

## VII.  AN UPWARD VARIANCE OF 24 MONTHS IS REASONABLE, BASED UPON THE RECORD AS A WHOLE.

The United States Court of Appeals for the Third Circuit has described its review of sentencing determinations as "limited yet important: we are to ensure that a substantively reasonable sentence has been imposed in a procedurally fair way." *United States v. Levinson*, 543 F.3d 190, 195 (3d Cir. 2008) (Jordan, J.). Thus, it reviews any sentence imposed using a two-step framework whose subparts are referred to generally as "procedural" and "substantive" reasonableness. Regardless of which step has been called into question, the party challenging the sentence bears the burden of demonstrating unreasonableness under an abuse of discretion

standard. *United States v. Tomko*, 562 F.3d 558, 567 (3d Cir. 2009) (Smith, J.) (en banc).

The first inquiry is procedural reasonableness, at which juncture the Court of Appeals asks whether imposition of the sentence was free from procedural missteps, "such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Id.* (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007) (Stevens, J.)).

"If the sentencing decision passes that first stage of review, we then, at stage two, consider its substantive reasonableness." *Levinson*, 543 F.3d at 195. "The touchstone of 'reasonableness' is whether the record as a whole reflects rational and meaningful consideration of the factors enumerated in 18 U.S.C. § 3553(a)." *United States v. Grier*, 475 F.3d 556, 571 (3d Cir. 2007) (Fisher, J.). "We are not sentencing judges. Rather, what we must decide is whether the district judge imposed the sentence he or she did for reasons that are logical and consistent with the factors set forth in section 3553(a)." *United States v. Cooper*, 437 F.3d 324, 330 (3d Cir. 2006) (Scirica, C.J.). "An estimation of the outer bounds of what is 'reasonable' under a given set of circumstances may not always be beyond debate, but the

abuse-of-discretion standard by which that estimation must be judged limits the debate and gives district courts broad latitude in sentencing." *Levinson*, 543 F.3d at 195. "This highly deferential standard of review allows us to overturn the District Court's decision only if the challenged findings are completely devoid of minimum evidentiary support displaying some hue of credibility or are without rational relationship to the supportive evidentiary data." *United States v. Farrell*, 445 F. App'x 506, 508 (3d Cir. 2011). "In other words, if the district court's sentence is procedurally sound, we will affirm it unless no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the district court provided." *Tomko*, 562 F.3d at 568.

"[A]ppellate review, limited though it is by the abuse-of-discretion standard, remains and requires district courts to plainly state the reasoning behind each sentence." *Levinson*, 543 F.3d at 197. "Moreover, in deciding on appeal whether the reasons provided by a district court are adequate, the degree that a sentence varies from the recommendation given in the Guidelines matters." *Id.* "Hence, while we eschew any requirement of direct proportionality, we may look for a more complete explanation to support a sentence that varies from the Guidelines than we will look for when reviewing a sentence that falls within a properly calculated Guidelines range." *Id.* In particular, "[t]he record must disclose meaningful consideration of the

relevant statutory factors and the exercise of independent judgment, based on a weighing of those factors, in arriving at a final sentence." *Grier*, 449 F.3d at 574.

After balancing the factors in § 3553(a) and given the court's full consideration of these factors in the instant case, the Court finds that a term of imprisonment that varies moderately above the Guideline range by 24 months is the only sentence sufficient but not greater than necessary to meet the sentencing objectives.

      **a.**      **Deterrence And Protection Of The Public Would Not Be Adequately Served By Imposing The Minimum Term Of Imprisonment.**

A leading decision by the United States Court of Appeals for the Third Circuit on upward variances in drug cases is *United States v. Varsanyi*, a 2010 opinion written by the Honorable Thomas I. Vanaskie, formerly of this Court. 392 F. App'x 15, 16 (3d Cir. 2010). Defendant Ariel Varsanyi pleaded guilty in the Scranton division of this Court to possession with intent to distribute more than 50 grams of crack cocaine. *Id.* at 16. The conviction stemmed from a traffic stop where Mr. Varsanyi fled on foot from a Pennsylvania State Police Trooper and discarded a plastic bag containing 63.4 grams of cocaine base. *Id.*

Mr. Varsanyi's guideline range was 97 to 121 months. Id. Application of a ten-year statutory minimum resulted in a guideline range of 120 to 121 months. *Id.*

By way of an upward variance, the Honorable James M. Munley imposed a sentence of 132 months (11 months above the high end of the guideline range). *Id.*

Judge Vanaskie, writing for a unanimous panel that included the Honorable Julio M. Fuentes and a senior district court judge sitting by designation, affirmed the sentence on both procedural and substantive grounds. *Id.* The Third Circuit wrote: "In imposing a sentence above the advisory guidelines range, the District Court explained that it had taken into consideration the fact that the crime of conviction involved a firearm, that Varsanyi's past convictions involved firearms, that additional criminal charges had been filed against Varsanyi while he was under pretrial supervision, and that Varsanyi had an extensive history of substance abuse." *Id.* at *17. Judge Vanaskie noted that "the District Court departed upwards only by eleven months above the advisory guidelines range." *Id.* at *18. Because "it could be said that 'no reasonable sentencing court would have imposed the same sentence on [Varsanyi] for the reasons the district court provided,'" the sentence was affirmed. *Id* (quoting *Gall,* 552 U.S. at 51). *Varsanyi* also confirms that the mandatory minimum is the proper starting point, so to speak, when calculating an upward variance in cases like this one.

In addition to *Varsanyi*, I also cite the following Third Circuit decisions for support: *United States v. Korbe*, 452 F. App'x 177, 178 (3d Cir. 2011) (affirming a 60-month upward variance in a drug, mail fraud, and firearms case); *United States v.*

*Fisher*, 597 F. App'x 685, 686 (3d Cir. 2015) (affirming 59-month upward variance in drug case "due to [defendant's] criminal history and likelihood of recidivism"); *United States v. Walker*, 529 F. App'x 256, 269 (3d Cir. 2013) (affirming 27-month upward variance in drug case where defendant was "a recidivist" and "significant period of incarceration . . . would better serve [his] chances for rehabilitation"); *United States v. Hall*, 556 F. App'x 146, 149–50 (3d Cir. 2014) (affirming 27-month upward variance in light of defendant's "role as a supplier in the methamphetamine conspiracy, the seriousness of the crime, the need for deterrence from similar crimes, and the need to avoid unnecessary sentencing disparities"); *United States v. Ramirez*, 460 F. App'x 119, 120 (3d Cir. 2012) (affirming 24-month upward variance in drug case in light of defendant's "lengthy and disturbing criminal history" and "concern that incarceration would not deter him from reoffending on release").

Here, Mr. Davis operated a substantial drug conspiracy, which had a palpable impact on the local community that is not proportionally accounted for by the Controlled Substances Act's minimum sentence for repeat offenders like Mr. Davis. Through the course of the trial, this Court witnessed firsthand a solemn procession of recovering addicts who were directly impacted by Mr. Davis's and Mr. Ruley's drug distribution scheme, and based on my assessment of the situation, protection of the public would be disserved by strict adherence to the minimum penalty.

Mr. Davis was not a run-of-the-mill heroin and cocaine trafficker. At his Tinsman Avenue residence, he maintained a storehouse containing enough bulk heroin to fill 4,157 bags, with a potential retail street value of $41,576. As the Government explained, one bag of heroin, selling on the street for approximately $10 to $15, contains about .025 grams of heroin, an individual dose that can be deadly, depending on its purity. Yet to trigger a five-year mandatory minimum sentence, at least 100 grams of heroin must be involved in the offense, or 4,000 doses of potentially fatal heroin. And in order for a ten-year mandatory minimum sentence to apply, at least one kilogram of heroin must be involved in the offense, or 40,000 doses of potentially fatal heroin.

Further, Mr. Davis's status as a repeat drug distributor indicates that a sentence with greater deterrent force is warranted as to this particular defendant.

**b.    The Guideline Calculations Understate Mr. Davis's Criminal History, Because They Assign No Criminal History Points To Several Of His Prior Offenses And Therefore Fail To Capture The Full Deterrent Effort That Mr. Davis Has Previously Flouted.**

Mr. Davis has a significant criminal history, reflecting a high risk of recidivism and contempt for the rule of law. While technically correct under the Sentencing Guidelines, Mr. Davis's criminal history category does not fully capture many of the more troubling aspects of his criminal record.

Mr. Davis has been convicted for a number of offenses involving domestic violence and reckless and dangerous behavior jeopardizing public safety. In 1999,

he served 15 days to 12 months for punching and kicking his girlfriend and throwing furniture that struck an eight-year old child. Presentence Report ¶ 35. That same year he pleaded guilty to the offenses of reckless endangerment and fleeing and eluding. After being stopped for an expired inspection sticker, Davis took police on a high-speed chase, drove through three stop signs, reached speeds of 80 miles per hour, hit a parked vehicle and crashed into a tree. He then fled on foot through a residential area and took off his shirt in an effort to escape the police. Presentence Report ¶ 36.

Consistent with the instant offense, Mr. Davis's other prior convictions reveal a pattern of drug dealing, corruption of co-defendants, and shameless efforts to evade police detection, avoid prosecution, and escape incarceration. Neither is this case Mr. Davis's first conviction for distributing drugs. In December 1999, a jury found Davis guilty of two counts of cocaine delivery and solicitation of minors to traffic in drugs. In that case, Mr. Davis, while in prison, instructed his girlfriend to sell drugs for bail money. Like his efforts to have Mr. Ruley take full responsibility in this case, Mr. Davis made his girlfriend carry the drugs so it would appear as if she was the drug dealer. Mr. Davis received a sentence of four to ten years in state prison, was paroled and recommitted four times for supervision violations, and ended up serving the maximum term. Presentence Report ¶ 37.

Moreover, during offenses of considerably less seriousness than drug dealing, such as speeding and driving without a license, Mr. Davis repeatedly provided false names and birth dates to police. Presentence Report ¶¶ 38–42. Indeed, the Presentence Report identifies 19 separate aliases used by Mr. Davis, and he himself reports that he was charged with home invasion in Connecticut, yet the offense does not appear in any automated criminal history databases. Presentence Report ¶¶ 2; 50. Mr. Davis's frequent use of aliases compounds the risk that there are other arrests and convictions not readily determined through those databases.

### c. Mr. Davis Occupied A Managerial And Supervisory Role Vis-À-Vis His Younger Co-Conspirator, Mr. Ruley, Which Conduct Is Not Reflected In The Guideline Calculations.

Mr. Davis is nearly fifteen years Mr. Ruley's senior. As the text messages between the two and the testimony at trial demonstrated, Mr. Davis often directed and controlled the pair's illicit activity. For instance, Ms. Burney Ruley testified that her son was a "gopher" who "made runs" for people to make money. In fact, Ms. Burney Ruley testified that she spoke with her son on the morning of his arrest. Mr. Ruley told her that "he had to go do something for 'Ant.'"

In varying upward on this ground, I am not applying the aggravating role enhancement set forth at U.S.S.G § 3B1.1. In fact, whether the factual pre-requisites for application of that enhancement were met is a question that has never been fully addressed on the record. Nevertheless, I believe that Mr. Davis's acting as a

managerial force rather than as a "runner" or a "gopher" supports an upward

variance from the mandatory minimum sentence in this case, as it speaks to the

severity of the offense conduct under § 3553(a) and the failure of prior sentences to

adequately deter Mr. Davis from engaging in similar criminal conduct.

      **d.**    **Beyond His Submission Of A Falsified Affidavit For Which The Guidelines' Obstruction Enhancement Was Applied, Additional Instances Of Mr. Davis's Post-Arrest Conduct Not Accounted For By The Guideline Calculations Were Inconsistent With Accountability And Rehabilitation, And Disrespected This Court As An Institution.**

In *United States v. Farrell*, 445 F. App'x 506, 508 (3d Cir. 2011), our Court of

Appeals affirmed an upward variance as to a defendant who was "thumbing [his]

nose at the court." In addition to the conduct comprising the obstruction of justice

enhancement, Mr. Davis engaged in substantial conduct during the pendency of this

litigation that had no other purpose but to scheme and manipulate.

For instance, prior to trial, Mr. Davis alleged that a local attorney possessed

information that the same drug evidence was erroneously logged in two different

Lycoming county drug investigations. This Court subpoenaed that attorney and held

an *ex parte* hearing to assess Mr. Davis's claims. At the hearing, the subject attorney

testified that he had no knowledge of the facts underlying Mr. Davis's allegation.

At trial, Mr. Davis requested that his counsel subpoena a Pennsylvania State

Police trooper so that he could be questioned as to the same allegation regarding the

double-counting of that same drug evidence. When asked to proffer what facts

supported that inquiry, defense could not offer anything but the mere say-so of Mr. Davis, and the request was denied.

Moreover, prior to trial, Mr. Davis wrote to me to invoke his Speedy Trial rights. However, after the jury was empaneled, he made an audible outburst into the gallery, alleging that he had not had enough time to prepare for trial with his counsel.

During the course of the trial, Mr. Davis engaged in a second outburst, accusing his trial counsel of collaborating with the Government. From that point forward, it was my determination that a Deputy United States Marshal should sit between Mr. Davis and his trial counsel, in order to ensure the latter's safety.

Finally, after the jury rendered its verdict, Mr. Davis made a third outburst, accusing the jurors that racial animus motivated their decision.   Pursuant to the decision of the Supreme Court in *Peña-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017), I note that I spoke privately with the jurors as a group after the conclusion of the trial about that particular allegation. The jurors unanimously reported that their verdict was shaped by the weight of the evidence and in no way by racial animus. In fact, several of the jurors belonged to racially-mixed families and were highly offended by Mr. Davis's unfounded accusations.

In addition, Mr. Davis has occasioned three separate motions to withdraw or motions for substitution of counsel as to three separate attorneys who have represented him since this 2016 case began. The Assistant Federal Public Defender

originally assigned to represent Mr. Davis noted that this case was only the fourth time in her 28-year career as a federal defense attorney that she had requested to withdraw. Those motions, like the one disposed of earlier, have often been strategically timed to delay the due administration of justice.

Viewed in isolation, this conduct may not be sufficient to warrant a variance in other cases. However, these instances were clear examples of Mr. Davis's continued and habitual attempts to manipulate this Court. Accordingly, it provides an independent basis for my decision to vary upward.

## VIII. IN CONFORMITY WITH *UNITED STATES V. CALABRETTA*, 144 MONTHS IS THE ONLY SENTENCE SUFFICIENT BUT NOT GREATER THAN NECESSARY TO SATISFY THE § 3553(A) FACTORS.

Finally, in a 2016 decision entitled *United States v. Calabretta*, 831 F.3d 128, 138 (3d Cir. 2016), the Third Circuit held that application of an erroneous Guideline range will typically constitute plain error, unless the Government can "point to parts of the record—including relevant statements by the judge—to counter any ostensible showing of prejudice." The Honorable D. Michael Fisher, dissenting in *Calabretta*, explained that, under the majority's rule, "[a] district court will now be required to specifically say, no matter what happens in the future, the sentence imposed is the only sentence it would give within its discretion." *Id.* at 148. I agree and now explicitly make that finding for the record as to Mr. Davis.

Pursuant to the Third Circuit's decision in *United States v. Calabretta*, I note that, given the extent of the underlying conspiracy and this Defendant's significant involvement in its operations, this Defendant's recidivist history and his blatant lack of respect for the law, as well as the effect of the criminal information and the accompanying mandatory minimum, the sentence imposed would be the same sentence imposed in the future even if Mr. Davis were to prevail on any later-raised objection, appeal, or collateral challenge that would ultimately alter his recommended Guideline range in any way, as the sentence I imposed is the only one sufficient to satisfy the 3553(a) factors outlined above.

## IX.  CONCLUSION

In accordance with the foregoing reasoning, I impose a sentence of 144 months. A detailed Judgment follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge